PACIFIC COAST CO. v. REYNOLDS et al.

(Circuit Court of Appeals, Ninth Circuit. March 17, 1902.)

No. 696.

1. SHIPPING—LIMITATION OF LIABILITY—VALUE OF STRANDED VESSEL.

Where a ship was stranded on a reef and so injured as to terminate her voyage, in order to secure the statutory limitation of liability the owner, when the vessel is not surrendered, must pay her value as she lay upon the rocks, and the amount of her freight then pending, if any. Her value for such purpose is not affected by the result of any subsequent salvage operations, whether undertaken by the owner or others; and where at great risk, hazard, and expense the owner succeeded in releasing her and having her towed to a port where she was valued, there must be deducted from such valuation, for the purpose of fixing the measure of his liability in limitation proceedings, not only the expense incurred in her rescue, but also an allowance on account of the risk and hazard of the salvage undertaking, which clearly affected her value as she lay before such operations were commenced.[1]

2. SAME—FREIGHT PENDING.

In respect to the pending freight, which must be surrendered by a shipowner in order to secure the statutory limitation of liability, the law is that freight pending is freight earned; and when the voyage is broken up by the wrecking of the ship before reaching her destination, there is ordinarily no freight earned, for, even though prepaid, in the absence of special contract, it may be recovered back by the shipper.

3. SAME—PASSAGE MONEY RECEIVED FROM PASSENGERS.

Where a ship, at the time she was stranded and the voyage terminated, was carrying passengers, who had prepaid their passage under contracts providing that in case of the loss of the vessel the passage money should not be refunded, such passage money must be considered the same as freight earned, and surrendered by the owner in proceedings for the limitation of liability; and no deduction can be made because certain of the tickets were given to the passengers by the shipowner, nor on account of a sum paid by such owner for the transportation of the passengers from the place of the stranding to their port of destination.

Appeal from the District Court of the United States for the Northern District of California.

Geo. W. Towle, Jr., for appellant.

Fred W Fry, J. D. Jones, L. H. Wheeler, and Wm. J. Tuska, for appellees.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. The following statement of the case by counsel for the appellant is not questioned by counsel for the appellees: On and prior to the 23d day of January, 1898, the Pacific Coast Company, a corporation, was the owner of the American registered steel steamship Corona, 230 feet long, 35 feet beam, 14 feet mean draft of water when fully loaded, and of 1,492 gross, and 996 net, registered tons measurement. That steamer, on January 23, 1898, and while on a voyage from Seattle to Juneau, and elsewhere in Alaska, with a full cargo and 250 passengers, ran upon a then unknown reef

---

[1] Limitation of owner's liability, see note to The Longfellow, 45 C. C. A. 387.

of rocks near Lewis Island, in Arthur's Passage and British Columbia waters, where she thereafter lay, stranded and helpless, until rescued by her owners. The point where the steamer was stranded is in latitude 54 degrees north, and was exposed to the severe gales which, in the winter season, prevail in that locality. The reef upon which the steamer was stranded extends out from Lewis Island for a little more than 1,200 feet, and is, at ordinary low tide, entirely submerged. At the extreme run out, that is, at the full and change of the moon, one small point of the reef, about 3 feet in diameter, projects about 6 inches above water. Where the Corona lay there was 12 feet of water above the reef at low tide. The tide, at this point, always runs in the same direction, and rises and falls about 25 feet. Where the steamer struck was about 1,200 feet from the shore of Lewis Island, which is there precipitous, and within about 15 feet of the extreme end of the reef. The reef at that point is about 40 feet wide, with an abrupt drop, on the northerly side, of 30 feet, and on the southerly side of 35 feet. The position of the Corona on the reef was such that had she shifted her position slightly she might have capsized and gone out of sight. In stranding, the steamer seriously damaged her keel, frames, and plates, breaking jagged holes in her bottom and bilges, and she lay across the reef with her stern depressed at an angle of about 30 degrees, and with a port list of about 20 degrees the tide ebbing and flowing through the steamer, which was submerged, at high tide, to within about 30 feet of her stem, and at low tide to about amidships. The keel of the steamer at the stern, the lowest point outside the reef, did not touch bottom by some 8 or 10 feet. After the steamer was stranded her passengers were landed on Lewis Island and there cared for until another steamer, the Oregon, came along, when they were placed on board of that vessel, and, at an expense of $2,500, forwarded to destination. The master of the Corona and her mate, a watchman, and four seamen remained by the Corona, living in a shack on Lewis Island,—all of the houses having been washed off the Corona in the heavy gales there prevailing,—until the arrival of Capt. C. M. Goodall, on February 15, 1898. Prior to going there Capt. Goodall, acting for the owner of the Corona, had, at an expense of $17,000, procured a wrecking outfit, consisting of a small steamer, the Maude, and divers, engines, pumps, etc., at Victoria, B. C., but could not, owing to the Alaskan mining fever then on at Dawson, get a suitable steamer for the work, and for assistance was obliged to rely upon such Indians and squaw men as could be found near the wreck. With such assistance, and under such conditions, the work of rescue was prosecuted, with the result that the Corona was, on March 3, 1898, so far pumped out as to float, but she then listed so far over onto the steamer that was secured to tow her to the beach when she should float that the master of that steamer cut his lines and left the Corona to go where she would. So left, the Corona, by the greatest of good fortune, as it then appeared, swung around and landed longitudinally on the reef, with her stern resting about where her midships section had before rested, and her bow towards the shore of Lewis Island. On March 7, 1898, the water was again pumped from the Corona so that she floated, and, by the

assistance of two steamers, she was towed to Irving, on the Skeena river, six or seven miles distant, to get her in a more sheltered position, so that her cargo could be shifted and her patchwork made sufficiently secure to justify an effort to tow the Corona to Port Townsend. Towing to Irving was, as testified by Capt. Goodall, an extremely hazardous undertaking, as the holes in the bottom were only stopped with waste stuck through the bottom, and the slipping out of one piece of waste would probably have resulted in the total loss of the Corona. The cost of getting the Corona to Irving was $19,-500. At Irving the cargo was shifted, and the waste in the holes in the bottom strengthened by cement backings from the inside, and, a tugboat of sufficient power having been secured from Victoria, the Corona was towed to Port Townsend, where she arrived on March 17, 1898. At Port Townsend the Corona was still leaking so badly that the divers' services were there needed, and it was with difficulty that the steamer's pumps handled the water so as to keep her afloat. After reaching Port Townsend the Corona was placed on the dry dock, at Quartermaster Harbor, where a survey was had and such temporary repairs made as were necessary to enable the steamer, at considerable risk, to be towed to San Francisco, the only place where the needed repairs could be made. The cost of getting the Corona from her stranded position to Port Townsend was $23,500, and the time consumed was from February 2 to March 17, 1898. The Corona was afterwards towed to San Francisco, and the total cost of getting the steamer from her stranded position to San Francisco was $35,-624.38. At San Francisco the hull, machinery, etc., of the Corona were thoroughly repaired, the steamer restored to her prior condition as far as possible at the Union Iron Works, at a cost for such repairs, exclusive of furnishings, of $94,403.96, or a total cost, including expenses of raising and towing and temporary repairs, of $130,028.34. There was also expended by the Pacific Coast Company, "for fittings, furniture, and supplies, to replace those lost by the stranding," the further sum of $17,983.63. The value of the Corona after she was so repaired and refurnished was $120,000. On April 6, 1899, many suits having been commenced against the Pacific Coast Steamship Company to recover damages for losses alleged to have been sustained as the result of the stranding, the last-named company and the Pacific Coast Company filed in the district court of the United States for the Northern district of California their several petitions for a limitation of their liability in the premises, and thereafter such proceedings were had, on notice, as provided by the court, to all parties interested, that on May 16, 1899, the said court, by its order, directed an appraisement of the Corona, and her freight pending, and of the several interests of the petitioners therein, to be made, and referred the matter of such appraisements to George E. Morse, Esq., as a commissioner to take testimony, make findings, and report thereon. Pursuant to that order the taking of testimony was commenced on July 10, 1899, and thereafter such proceedings were had that the said commissioner, on April 18, 1900, filed, in open court, his report and his supplemental report, in the premises, thereby finding and reporting that the cost of raising the Corona and towing

her to Port Townsend was the sum of $23,500; that the cost of rais-
ing the Corona, temporary repairs at Port Townsend, and towing
to San Francisco was the sum of $35,624.38; that the total cost of
raising, towing, temporary repairs, and permanent repairs made at
San Francisco was the sum of $130,028.34; that there was expended
"for fittings, furniture, and supplies, to replace those lost by strand-
ing," the further sum of $17,983.63; that the value of the Corona,
her engines, boilers, machinery, tackle, apparel, furniture, etc., after
she was completely repaired and refurnished, was the sum of $120,-
000; that the value of the Corona, at the end of her voyage, to wit,
as she lay stranded, was the sum of $9,500; that the value of the
freight pending was the sum of $11,637.47, and that the Pacific Coast
Company was the sole owner. Thereupon, and on April 21, 1900,
the Pacific Coast Company served and filed its exceptions to such re-
port, and the appraisements thereby made, upon the grounds, among
others, that the several appraisements of value therein stated were
excessive. After a hearing had on such exceptions, the said court,
on November 30, 1900, by its order entered in such proceedings,
overruled all of such exceptions, and thereafter, on January 14, 1901,
entered its final decree in the premises, whereby it was adjudged and
decreed that the value of said Corona, as she lay stranded, was the
sum of $9,500, and that the value of her freight then pending was the
sum of $11,637.47, and that the limit of liability of the Pacific Coast
Company, in the premises, is the sum of $21,137.47, and thereby or-
dered the last-named company to give, within 30 days from the date
of said decree, "a stipulation, with sufficient sureties to be approved
by this court, for the payment of said sum of $21,137.47, or any part
thereof, into court whenever the same shall be required." From that
decree, the stipulation ordered not having been given, this appeal has
been prosecuted by the Pacific Coast Company, upon an assignment
of errors therein.

The assignment of errors presents the questions: (1) What was
the value of the steamship at the end of her voyage, that is, as she lay
stranded on the reef? and (2) what was the value of her freight then
pending? The law is well settled that in such cases as the present one
the owner, in order to secure the limitation of liability provided for
by the statute, must pay the value of the ship at the time her voyage
was ended and the amount of her then pending freight. The City
of Norwich, 118 U. S. 468, 6 Sup. Ct. 1150, 30 L. Ed. 134. "If,"
said the court in that case, "by reason of the loss or sinking of the
ship the voyage is never completed, but is broken up and ended by
causes over which the owners have no control, the value of the ship
(if it has any value), at the time of such breaking up and ending of the
voyage, must be taken as the owner's liability. In most cases of this
character no freight will be earned, but if any shall have been earned
it will be added to the value of the ship in estimating the amount of
the owner's liability. These consequences are so obvious that no at-
tempt at argument can make them plainer." 118 U. S. 492, 6 Sup.
Ct. 1156, 30 L. Ed. 143. The court then proceeded to say:

"If this view is correct, it follows, as a matter of course, that any salvage
operations, undertaken for the purpose of recovering from the bottom of the

sea any portion of the wreck, after the disastrous ending of the voyage as above supposed, can have no effect on the question of the liability of the owners. Their liability is fixed when the voyage is ended. The subsequent history of the wreck can only furnish evidence of its value at that point of time. And it makes no difference, in this regard, whether the salvage is effected by the owners or by any other persons. Having fixed the point of time at which the value is to be taken, the statute does the rest. It declares that the liability of the owner shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending. If the vessel arrives in port in a damaged condition, and earns some freight, the value at that time is the measure of liability; if she goes to the bottom and earns no freight, the value at that time is the criterion. And the benefit of the statute may be obtained either by abandoning the vessel to the creditors or persons injured, or by having her appraisement made and paying the money into court, or giving a stipulation in lieu of it, and keeping the vessel. This double remedy given by our statute is a great convenience to all parties. It does not make two measures or standards of liability, for the measure is the same whichever course is adopted, but it enables the owner to lay out money in recovering and repairing the ship without increasing the burden to which he is subjected."

Turning now to the findings of the commissioner, approved and adopted by the court below, we find that the value of the ship at the time her voyage was ended was fixed by taking the lowest estimate of her value at Port Townsend, to which place she was towed from the place of her wreck, made by any of the witnesses, which estimate amounted to $33,000, and deducting therefrom the actual cost of getting the ship to Port Townsend, which was found to be $23,500, thus leaving $9,500 as the value of the ship as she lay on the reef at the end of her voyage. It is manifest that this eliminated from the problem any and all risk or hazard attending the undertaking. The evidence in the case leaves no room for doubt that the risk and hazard were great. The position of the ship on the reef was itself the strongest sort of evidence of that fact. And there was risk that, in the event the vessel could be successfully floated and repaired, the cost might exceed her value when all of that was done. And the findings here expressly show that such cost actually did exceed the value of the ship when the repairs were completed by more than $10,000. It is true that this subsequent history of the wreck is not conclusive evidence of the fact that she was of no value as she lay upon the reef, for the demand for ships at the time of the completion of her repairs and other considerations may have entered into the question of her then value. But that the subsequent history of the wreck does furnish some evidence of its value at that time was expressly decided by the supreme court in the case of The City of Norwich, supra. Added to this is the undeniable fact that the owner actually risked the $23,500 that the findings show that it cost to get the ship from the reef to Port Townsend. This amount is more than double that fixed by the findings as the value of the ship as she lay upon the reef. Such cases admit of no exact rule for fixing values, but, the record in this case considered, we are of opinion that the latter amount should be reduced two-thirds; that is to say, that the value of the ship at the time of the termination of her voyage should be fixed at $3,166.66.

In respect to the pending freight, the law is that freight pending is

freight earned. Carv. Carr. by Sea (2d Ed.) § 547; The City of Norwich, supra; The Scotland, 105 U. S. 24, 26 L. Ed. 1001; The Main v. Williams, 152 U. S. 122, 14 Sup. Ct. 486, 38 L. Ed. 381; The Abbie C. Stubbs (D. C.) 28 Fed. 719; In re Meyer (D. C.) 74 Fed. 881. And freight is not earned until the goods are carried to and delivered at the place of destination. Authorities supra. And, further, freight paid in advance may, in the absence of a special agreement to the contrary, be recovered back if the voyage be broken up and the goods be not carried for any cause not imputable to the shipper. In re Liverpool & G. W. Steam Co. (D. C.) 3 Fed. 168; Brown v. Harris, 2 Gray, 359, cited with approval by the supreme court in The Main v. Williams, 152 U. S. 122, 14 Sup. Ct. 486, 38 L. Ed. 381. It results that the item of $3,867.47 for prepaid freight, wharfage, and advance charges must be deducted from the amount the petitioner should be required to pay in order to secure the benefit of the statute limiting its liability, even if all of the items entering into that charge can be properly regarded as freight.

Included, also, within freight pending, as found and decreed by the court below, is the item of $7,770 prepaid passage money. It is insisted on the part of the appellant that passage money and freight are governed by the same rules, and that the passage money was no more earned by the Corona than was the freight. There is in this case, however, this important distinction between the two items: In the contract between the owner and the passengers there was this express stipulation, to wit, "In the event of the loss or detention of the steamer during the voyage, the vessel, her owners or charterers, shall not * * * refund the amount of passage." This was not, as argued by counsel for the appellant, a collateral contract, such, for instance, as a contract for insurance upon the vessel or freight which, it was held in the case of The City of Norwich, supra, and in other cases, need not be surrendered by the owner in a limited liability proceeding, but the stipulation here entered into and constituted a part of the contract of carriage itself. As therefore the passage money in question was prepaid under an express agreement that the owner of the ship should not refund it, notwithstanding a failure to deliver the passengers at the place of destination, we think it clear that it must be regarded as earned. It is urged, however, on the part of the appellant, that in any event there should be deducted from the amount of the prepaid passage money the $2,500 expended by the owner in forwarding the passengers to their destination, as, also, the sum of $475 claimed to have been refunded by the owner to some of the passengers. It is said that the decision of the supreme court in the case of The Scotland, supra, requires this to be done. In respect to the $475 it appears from the evidence that the owner of the ship furnished to certain of its passengers tickets from Seattle to Skagway, aggregating that sum, taking from such passengers a receipt for the ticket declaring:

"This ticket is furnished me, not on account of any obligation of the company to me, but as a donation to assist me in returning to Alaska. I hereby accept same as above, and release said company from all liability for loss I sustained on steamer Corona."

The appeal to a court of justice of one who has made gifts, by which it is sought to make good the donations out of third parties, must always fall upon deaf ears. The judgment of the supreme court in the case of The Scotland did affirm that of the lower court in that case, wherein there was deducted from the prepaid passage money certain, moneys returned to the passengers and certain money expended by the petitioner in taking care of them pending their reshipment. But in the case of The Scotland the contract of carriage contained no agreement, as does the contract in the present case, expressly stipulating that the passage money should not be refunded in the event of the loss or detention of the steamer during the voyage. The passage money in The Scotland case was therefore just as much subject to recovery by the passengers for failure to carry them to the place of destination as was the money prepaid for the carriage of property, since each are governed by the same rules, and in neither was the amount prepaid earned. In the present case the amount prepaid for passage was, by the express stipulation of the parties, made absolute and unconditional, and should, in our opinion, be regarded as earned.

For the reasons stated the findings and judgment of the court below must be so modified as to reduce the value of the ship at the time of the termination of her voyage to $3,166.66, and the value of her then pending freight to $7,770, making the full limit of the petitioner's liability $10,936.66, and, as so modified, the judgment is affirmed.