### THE SILVERPALM.

### In re SILVER LINE, LIMITED.
#### No. 21697–L.

District Court, N. D. California, S. D.
Dec. 28, 1935.

Ira S. Lillick, Joseph J. Geary, and Lillick, Olson, Levy & Geary, all of San Francisco, Cal., for petitioner.

H. H. McPike, U. S. Attorney, and Robert L. McWilliams and Esther B. Phillips, Asst. U. S. Attorneys, all of San Francisco, Cal., for claimants.

LOUDERBACK, District Judge.

This is a petition of the Silver Line, Limited, a corporation, of the Kingdom of Great Britain, to limit its liability for the damages arising out of the collision which occurred on October 24, 1933, between its motorship, the Silverpalm, and the United States cruiser, Chicago. The collision occurred in a fog on the high seas about twenty miles from Point Sur, California. The responsibility for the collision was before this court in the trial of the libel and cross-libel in the case entitled United States of America vs. Silver Line, Limited, No. 21666, in which the Silverpalm was held solely at fault for the collision. The petition of the Silver Line to limit its liability in damages to the value of the Silverpalm and her freight then pending rests upon provisions of title 46, section 183 of the United States Code Annotated, R.S. § 4283.

The issue before the court is whether the Silver Line, Limited, has shown that the losses complained of have been done, occasioned, or incurred, without the privity or knowledge of the Silver Line. The testimony and the exhibits are voluminous and time does not permit, in this opinion, an analysis and detailed review of all the evidence presented upon the issues. The court can but summarize and make its findings upon the evidence.

The evidence shows that the Silverpalm was a motorship, medium grey in color, with a length over all of 475 feet, length between perpendiculars of 450 feet, beam 62½ feet, depth 50 feet, two masts, one smokestack, gross tonnage 6,373, cargo capacity 8,000 to 9,000 tons, and carried about 7,000 tons of cargo on the voyage involved in this litigation. The Silverpalm was built in England in 1929, had Doxford Diesel engines, two-cycle, of the opposed piston type, an engine which was developed about twelve years prior to the collision. The characteristic of this engine, to which much of the testimony was directed, was the method of reversal. When the order "full astern" is given, the engineer on duty cuts off the fuel supply and the engine continues to run ahead until the friction of the water, the drag of the propeller, and the weight of the ship bring the engine to a stop. When it has stopped, it can then, and only then, be started astern. Although, of course, the momentum of the ship may be such that the ship will continue to forge ahead for some time after the engines will have started astern. The interval of time that must elapse between the order to reverse engines and the moment of the engines reversal, depends upon the speed of the ship when the order to reverse is given. The witnesses who testified in this proceeding are in substantial agreement that at "slow" or "moderate" speeds (defined by them as from four to six knots or less per hour) the time within which reversal of the engines can be accomplished is short and compares favorably with marine engines of other types. When, however, the ship is proceeding at more than six knots per hour, the comparison is unfavorable. When the Silverpalm made full speed or approximately full speed (108 to 118 revolutions in the engines, or from 13½ to 15 knots per hour), the time required between the order to reverse engines and actual reversal is between four or five minutes, according to the estimates made by the engineers of the Silverpalm in October, 1933, and by other witnesses called by the petitioner. Test runs made two months after the collision by agents of petitioner showed that when the ship was proceeding at 108 revolutions it required three minutes and two to four seconds, light wind being astern, to bring the engines to a stop; and two minutes and twenty-one seconds with the wind ahead and a hard right rudder being used. The ship carried 2,000 tons less cargo when

these tests were made than were carried at the time of the collision. There is an unaccountable lack of testimony to show whether or not conditions in the engine room were identical when the later test runs were made, with the conditions existing in October, 1933, at the time of the collision. Had they been the same, it should have been shown. The absence of testimony on this point would indicate that the ship's reversing abilities in October, 1933, were no better than in December, 1933, and possibly not as good, given identical conditions.

Testimony as to the reversing abilities of other marine engines going at high speeds shows, without conflict, that the order to reverse engines can be executed on the reciprocating-engined vessel, the turbine-engined vessel, and on vessels having other types of Diesel engines, in much shorter time than on the Doxford Diesel type. Of all the witnesses who testified, there was only one who had experience with a vessel which required as much as two minutes to put the engine astern, and he considered such characteristic "very unusual." The witnesses showed a range of fifteen seconds to "within the minute" as being a reasonably prompt response for engine reversal, to an order "full astern" given when a ship was proceeding full ahead or nearly full ahead at 13 or 14 knots. This comparison applies to Diesel engines of types other than the Doxford Diesel. The braking power of the Diesels—that is, bringing the engine to a point of rest—was clearly shown by the witness, Professor B. M. Woods, whose testimony was most persuasive. A practical comparison was in fact made by petitioner's witness, Captain Archibald A. Dunning, who had acted as bar pilot on the Silverpalm. He knew the Silverpalm to be a Diesel-engined ship, but did not know the Doxford engine and thought it ought to have been able to put its engines astern within a minute from the time the order was given, if the ship was traveling 14 knots.

The court has considered this characteristic of the Silverpalm in this detail because it seems to the court such an engined ship, particularly without brakes, more dangerous at high speeds than ships with other types of engines. Thus, petitioner's witness, Captain Ensor, testified that over six knots is a rather dangerous speed for stopping quickly in an emergency.

There was evidence to show that a brake was perfected for use on the Dox-ford-engined ships in 1923, which was furnished to the English Doxford Company. There was some conflict in the evidence as to its safety, and its success, but the great weight of the evidence showed that the brake was safe, and materially reduced the time required to stop the engine. The evidence shows that the petitioner had knowledge of this brake, but, on the advice of engineers, did not install the brake on the Silverpalm. There were, at the time of the collision, 109 ships with Doxford Diesel engines, more than 30 of which were equipped with brakes.

The question was argued at length, whether or not the Silverpalm was to be regarded as unseaworthy because of these characteristics of her engines when operated without a brake. It is plain, however, that the engine, as installed on the Silverpalm, is inherently dangerous, since it is not readily controllable when proceeding at a speed greater than six knots. Despite the fact that this is an engine of expert mechanical efficiency, it is most regrettable that the development of greater efficiency in one direction should be at the sacrifice of safety in another. While the evidence shows clearly that this type of engine, without a brake, was approved by the engineering experts with whom the Silver Line conferred prior to the building of the Silverpalm, this does not solve the issue of the right to judicial determination upon an engine inherently dangerous when running at the speed which must be maintained a large part of the time for the purpose of commercial usefulness. This is true of the Silver Line, which had not installed, on the Silverpalm, a known device—the brake—which would have materially controlled and lessened this inherent dangerous feature, all to the greater safety of property and life.

The operating schedules of the Silverpalm required her to make an average speed of 13 knots. It is claimed that the schedules were sufficiently elastic to allow the Silverpalm to navigate at slow speed when safety required it, and to make up time at her extra speed of 15 knots when good conditions permitted. The operating schedules of a vessel do not of themselves show either a safe practice or a negligent practice. They may be pertinent to show what is desired or hoped for. The navigation of a ship at high speed in a fog on a particular occasion is one issue; frequent navigation by a particular master at high speed in fog is another. Navigation at

high speed in a fog with such frequency that the shipowner knows it, or ought to know it, is another issue. If the last situation exists, the court cannot believe that the shipowner may have a free conscience and be held not privy to the negligent practice. The public interest requires that the shipowner should not close his eyes to it. There is just as much reason for holding that privity with this negligent practice should defeat the limitation application, as there was in denying limitation because of the practice of overloading, as in The Vestris (D.C.) 60 F.(2d) 273, or because of the practice of steering a course too close to a foggy coast, as in The Santa Rosa (D.C.) 249 F. 160.

While I find no case which directly holds that knowledge of the practice of navigating at high speed in a fog is ground for denying limitation of liability in a case where a collision resulted from such high speed in a fog, in the case of La Bourgoyne, 210 U.S. 95, 28 S.Ct. 664, 52 L.Ed. 973, Id. (C.C.A.) 139 F. 433, 435, privity was attempted to be proved because the steamers of the line involved frequently violated the rule of moderate speed in a fog, and that it must be assumed that the officers of the petitioners in that case knew of such violation. This proof was held inadequate to establish privity, and it was held, further, in these cases that the evidence did not establish such a practice, but it would seem to have been recognized that the logbooks, had they been obtained, would have been admissible as evidence to show a negligent practice. Judge Gilbert, in his opinion in Boston Marine Ins. Co. v. Metropolitan Redwood Lumber Co. (C. C.A.) 197 F. 703, says that knowledge of the negligent practice of proceeding full speed in the fog was not brought home to the shipowner in the case before him.

The master of the Silverpalm had taken command of her the May preceding the collision in October, 1933. He had previously commanded the petitioner's Silverash from August, 1929, to October, 1930, and the Silver Walnut from April, 1931, to December, 1932, and was on leave of absence in the intervals between commands. The logs of the Silverash, a Doxford-engined vessel, show repeated instances of navigation at high speed in a fog, frequently described as "thick" or "dense." The logs of the Silver Walnut, a Diesel-engined vessel of the Burnmeister-Wain type, showed a similar practice of speed

during fogs. The logs of the Silverpalm show many instances of navigation by preceding masters at full speed in fog of different density, including "dense" fog, and several instances between May and October, 1933, when commanded by Captain Cox, in "thick" fog. While it cannot be said that there was a uniform practice never to reduce speed, the speed was maintained more often than not, and even when a reduction is noted in the logs, the engine room logs indicate that the "reduced" speed was still high.

There seems to be no better test to apply than Judge Learned Hand's, that "the degree of care exacted in any situation depends, not only upon the likelihood of injury, but on its gravity if it comes," The Linseed King (C.C.A.) 52 F.(2d) 129, 132.

Considering the damages attendant on navigation of the Silverpalm at high speed in a fog, there is no doubt that special care was called for, not only by the master in obeying the law and his instructions, but by the shipowners in determining whether or not the ship was being navigated negligently. The logs of each voyage, as well as the interim reports, during the course of the voyages, were regularly sent to the petitioner by each vessel, to the petitioner's head office, and there examined by responsible officers, for information as to the possible claims on underwriters, operating conditions, maintenance of schedules, etc. Considering the negligent practices revealed in these documents, I am not satisfied with the proof of a lack of privity on the part of the petitioner. I think the shipowner must be deemed to know what the logs showed, as in The Vestris (D.C.) 60 F.(2d) 273, and to have acquiesced in the practice of the Silverpalm's master, this in view of what was disclosed in the logs of petitioner's vessels while under the command of Captain Cox and other masters.

The master of the Silverpalm had passed through the various grades of licensed merchant marine officer, provided under British law, and had served his country as a naval officer with distinction, during the World War. He came into the petitioner's employment with proper credentials from prior employers. His experience with the Doxford engines seems to have been while on the Silverash, and the Silverpalm. His first knowledge of the delay and lapse of time in attempting to reverse when going full ahead came on the morning of the collision. His deposition,

given a very few days after the collision, showed that he knew nothing of the time actually required for reversal, and that at that time he thought there was nothing unusual in the Silverpalm's reversing abilities, which was not common to other ships of his acquaintance. When testifying in open court, he was somewhat inclined to avoid the questions as to his knowledge of the reversing characteristics of the Silverpalm. Taking his testimony as a whole, it shows that up to the time of the collision he thought the Silverpalm could be put in reverse in the normal time of other ships. The very fact that he gave a second order to reverse engines, on the occasion of the collision, after the engineer had signaled that he was stopping the engines, is significant.

All witnesses testifying on both sides are agreed that the ship's captain should know the time required to put the engines astern. Petitioner's witness, Stanley F. Dorey, was the most emphatic in this, and its witness, Captain Dunning, went so far as to say that if he was piloting a ship which was unable to put her engines in reverse in two minutes, he thought the captain of such a ship should advise him, the pilot, of that fact. Captain Ross A. Culp, of the United States Navy, a witness for the claimants, stated that the captain of a ship should know the approximate time required for reversal of the engines of his ship.

In Standard Oil Co. v. Clan Line, L. R. 124 App.Cas. 100 (J.L.), the master of the Clan Gordon, while at sea, ordered two of her water ballast tanks emptied for the purpose of trimming her more by the stern. When they were nearly empty she heeled, turned over, and became a total loss. Some years previous, after the loss of a sister ship, by capsizing, the builders had warned the owners that when the ship was loaded as she was on this voyage, the water ballast tanks must be kept filled. This information was never given to her officers. It was held that the vessel was inherently unseaworthy in certain improbable events, unless special precautions were taken, and that the failure to warn the master constituted a breach of the shipowner's duty to exercise due diligence. It was said that there is no difference in principle "between disabling want of skill and disabling want of knowledge."

In The Vestris, supra, there was a want of knowledge by the ship's officers respecting the ballast to be used to insure stability, and, as a consequence, ballast was removed in the effort to correct a list, during a storm. The list was aggravated by this act, and it was held a contributory cause of the foundering of the ship which followed.

The want of knowledge of the Silverpalm's slowness in reversing, at speeds over six knots per hour, must have affected the speed maintained by the master, while the ship was in the fog. Had the captain known the full risks he ran, I can hardly believe that he would have failed to slacken speed to the moderate or slow speed at which the ship was readily controllable. The severity of the collision in question was due not only to the fact that the Silverpalm was navigating, prior to the collision, at too great speed in a fog, but also to the fact that the Silverpalm was still running at high speed when she struck, after two minutes of effort by the Silverpalm's officers to check her speed.

It is urged by the claimants that the petitioner must have known the characteristics of the Doxford engine when used without a brake and of the Silverpalm's slowness in reversal, as compared with other types of mechanically propelled ships. Petitioner urges that until the test runs were made in December, 1933, petitioner had no accurate knowledge of the reversal characteristics of the Doxford engine.

After reviewing the testimony of many witnesses testifying for petitioner upon the building of the Silverpalm and several sister ships, I find nowhere did any of the witnesses express surprise or ignorance of her slowness in reversing her engines, as exhibited in the test runs at San Francisco in December, 1933, or as shown on the morning of the collision. The characteristics of the engine were charged in the pleadings as a fault, and were the chief subject-matter of several depositions. The classification by Lloyd's Society called for reversal tests, which must certainly have been performed upon a vessel of the Silverpalm's type. The builders' dock tests undoubtedly included reversal tests. I cannot believe that petitioner would have built, as it did, a fleet of six Doxford-engined vessels, and done this, too, without accurate knowledge of one of the most salient characteristics of the engine.

■■ I believe the petitioner is in a dilemma in urging that it had no accurate knowledge of the reversal time, and yet is not in fault for failing to have such knowledge; that, having no accurate knowledge,

it is not at fault for failing to see that the captain in command had such information; and that the captain, although he had no such knowledge, is to be regarded as competent to command this vessel. These contentions cannot all be sound. If the Silver Line had such information, then it was its duty to inform the captain, under the rule of Standard Oil Co. v. Clan Line, supra, The Vestris, supra, and The Schwan, R.L. [1909] App.Cas. 450 (H.L.), and is negligent if it did not. But if petitioner did not have such information, I see no escape from the conclusion that it should have acquired such information, or it should have selected a master specially qualified to handle a Doxford-engined ship, and who had the necessary information. In other words, either there is a personal fault on the part of the petitioner, or there is a ship that is unseaworthy because of lack of a qualified master. This, surely, is the minimum of protection that public interest requires.

The injunction granted by this court shortly after the petition was filed, enjoined all persons from prosecuting these claims. Thereafter, upon a motion to modify the injunction, based upon the pleadings, which alleged the foreign character of petitioner, the law governing the deaths occurring outside territorial waters, etc., I held that the Death on the High Seas Act contemplated denial of limitation of liability as against certain types of death claims. The injunction was modified, pursuant to such ruling, to permit the prosecution of suits by the designated parties. This ruling is now on appeal. Upon the trial on the merits, the death claimants offered evidence to show as a fact their rights under British law to recover death damages. Proof of the British law involved in this issue was made by stipulation of counsel, and this statement of British law was approved by the British counsel of petitioner, in England. I find, upon such stipulation that the British law upon this subject is the same as the law of the forum.

In conclusion, I would state that I have not accepted the contentions of either side to this limitation petition, in their entirety. I have elected to add to this opinion my findings of facts, as follows:

1. The Silverpalm, owned by petitioner, a corporation organized under the laws of the Kingdom of Great Britain, was, at the time of the collision with the United States cruiser, Chicago, on October 24, 1933, equipped with Doxford Diesel two-cycle engines, of the opposed piston type, without brakes. This engine can be reversed as readily as other type of marine engines when the ship is running at a slow or moderate speed, not to exceed six knots per hour. At a speed in excess of six knots the engine is not as readily reversed and is dangerous in a situation of emergency which requires prompt reversal. At 13 knots, or over, the time required between an order to reverse and the completed execution of the order by the engine is three, four, or even five minutes, depending on the circumstances of loading, tide, current, wind, etc. This presents a great hazard in a situation of emergency which requires prompt reversal. This time requirement and resulting hazard is not present in comparable degree in the case of other ships differently engined, in a similar situation, such as turbined-engined ships, reciprocating-engined ships, and Diesel-engined ships of other types. Their normal time for reversal is within one minute from the giving of the order to reverse.

2. The characteristic of Doxford Diesel-engined ships, as the Silverpalm, makes navigation in a fog at more than moderate speed, or at high speed, very dangerous, more so than with ships of other engined types, equipped with engines capable of prompt reversal.

3. The petitioner gave instructions to the master of the Silverpalm and to the masters of its other vessels to obey the rules of navigation as to the speed in a fog. Its orders have not attempted to interfere with the discretion of the master in that regard. The master in command of the Silverpalm at the time of the collision had navigated so frequently in situations of fog, including dense fog, at high speed during his years of employment with petitioner, as to put petitioner on some duty of inquiring either during his prior commands under petitioner, or at the time he was in command of the Silverpalm. Petitioners knew or should have known that his practice of navigation at high speed in fog was sufficiently frequent to constitute his command of the Silverpalm dangerous, unless warned about the time required for reversal. In this respect I find a fault on the part of petitioner which contributed to the collision.

4. The master in command of the Silverpalm at the time of the collision was not in fact informed, or had any knowledge of the reversing characteristics peculiar to vessels having Doxford engines. He had no prior experience or information upon

the time required to reverse engines when the Silverpalm was proceeding at 13 knots, or approximately 13 knots per hour, and believed that at 13 knots he could reverse his engines and thus take the way off the ship as quickly as in the case of other properly equipped vessels. On the occasion in question, he was proceeding at 13 knots or more in a fog and could not control his ship in time to avoid collision.

5. The petitioner knew, or should have known, these characteristics of the Silverpalm, and either should have informed the master of the ship, or should have selected a master with known qualifications for command of such engined ships. Not having such information, he cannot be deemed fully competent to handle the Silverpalm. I find contributing fault on the part of petitioner, whether petitioner be regarded as not knowing the characteristics of the Silverpalm, or whether it be regarded as knowing them, but as having selected a captain without such knowledge, and permitted him to navigate the Silverpalm without petitioner giving him knowledge of such characteristics.

6. Under British law, there is a right of action against a British shipowner in favor of the personal representative of the wife, children, and/or parents of persons killed by the negligent operation of his ship, for the benefit of such person or persons. This right of action is not limited to British citizens, nor to deaths occurring on British soil. It may be asserted on account of death occurring on the high seas, on board a foreign ship, caused by the negligence of a British ship.

From the foregoing findings of fact, I conclude, as a matter of law, the petition for limitation should be denied.

Let a decree be entered accordingly.