BOSTON MARINE INS. CO. et al. v. METROPOLITAN REDWOOD LUM-
BER CO. et al.  SWIFT et al. v. SAME.  In re METRO-
POLITAN REDWOOD LUMBER CO.†

(Circuit Court of Appeals, Ninth Circuit.  July 15, 1912.)

No. 2,092.

1. COLLISION (§ 81*)—FAULTS IN NAVIGATION—SHORTAGE OF CREW.

That a vessel was one man short of her full complement of seamen, and had no one stationed between the lookout forward and the officer on the bridge, *held* not a contributing cause of a collision in a fog, where no such intermediate lookout was required by law, and there was no evidence that it was customary or .necessary to maintain one, or that the officer did not hear all the calls of the lookout.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 157–166; Dec. Dig. § 81.*]

2. COLLISION (§ 25*)—LIMITATION OF LIABILITY—PRIVITY OF OWNERS.

That a vessel was being unlawfully navigated at full speed in a fog at the time of a collision, and that the master had previously navigated her at such speed, because she was a slow vessel, does not establish the privity of the owners so as to debar them from the right to a limitation of liability, where they had no knowledge of such practice and were justified in believing the master to be competent.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 21; Dec. Dig. § 25.*]

3. COLLISION (§ 25*)—LIMITATION OF LIABILITY—PRIVITY OF OWNER.

An owner of a vessel, in order to be entitled to a limitation of liability under the statute, is not required, when fitting her for a voyage and selecting her officers and crew, to have and exercise a scientific knowledge of navigation or concerning her equipment, and he cannot be charged with privity in respect to a collision caused in part by improper navigation of the vessel, where the master he employed was duly licensed and well recommended and had served as master for several years with nothing known against his reputation or competency.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 21; Dec. Dig. § 25.*]

4. COLLISION (§ 25*)—LIMITATION OF LIABILITY—SEAWORTHINESS.

A steam schooner *held* not unseaworthy so as to deprive the owner of the right to limit its liability for a collision in a fog because of the noise made by her .oil burners, which were of a type in customary use on such vessels, and where it was shown by the testimony of competent witnesses that the noise did not interfere with hearing signals from other vessels or determining their direction.

[Ed. Note.—For other cases,  see Collision, Cent. Dig. § 21; Dec. Dig. § 25.*]

*For other .cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Rehearing  denied October 7, 1912.

**5.** COLLISION (§ 25*) — LIMITATION OF LIABILITY — VALUATION OF DISABLED VESSEL.

Where a vessel was so injured in a collision as to terminate her voyage, the sum which her owner must pay in proceedings for limitation of liability is her value immediately after the collision as she lay at the place of collision, and where she was afterward towed into a port there should be deducted from her value after she reached such port not only the expense of her salvage, but an allowance on account of the risk and hazard to which she was subject and affecting the probability of her rescue.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 21; Dec. Dig. § 25.*

Limitation of owner's liability, see note to The Longfellow, 45 C. C. A. 387.]

**6.** SHIPPING (§ 210*)—LIMITATION OF LIABILITY—DISTRIBUTION OF FUND.

Under Rev. St. § 4284 (U. S. Comp. St. 1901, p. 2943), which provides that the proceeds of a vessel surrendered in proceedings for limitation of liability shall be distributed among the claimants "in proportion to their respective losses," all claimants who establish a right to share in the fund are entitled to payment pro rata irrespective of their general right to priority as lien claimants.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 660; Dec. Dig. § 210.*]

**7.** SHIPPING (§ 209*)—COSTS—PROCTOR'S DOCKET FEE.

The docket fee allowed by Rev. St. § 824 (U. S. Comp. St. 1901, p. 632), to a proctor on a final hearing in admiralty, is for his appearance and service on the hearing, and not as a fee for appearing for each client whom he represents, and in a proceeding for limitation of liability a proctor representing several claimants who recover is entitled to tax but one docket fee.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 646–655, 659, 661, 662; Dec. Dig. § 209.*]

**8.** SHIPPING (§ 210*)—LIMITATION OF LIABILITY—COSTS—EXPENSE OF ADMINISTERING FUND.

In proceedings for limitation of liability, the cost of issuing and publishing the monition is an expense to be paid out of the fund.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 660; Dec. Dig. § 210.*]

Appeal from the District Court of the United States for the Northern District of California.

In the matter of the petition of the Metropolitan Redwood Lumber Company, as owner of the steam schooner San Pedro, for limitation of liability on account of a collision between such vessel and the steamship Columbia, owned by the San Francisco & Portland Steamship Company. From a decree holding both vessels in fault and granting the petition for limitation of liability, the Boston Marine Insurance Company and others and John Swift and others appeal. Affirmed.

The appellee, the Metropolitan Redwood Lumber Company, a corporation, presented its petition to the court below for a decree limiting its liability under sections of the Revised Statutes, 4282 to 4289, inclusive (U. S. Comp. St. 1901, pp. 2943, 2944), and the several acts amendatory thereof. It alleged that it was the sole owner of the steam schooner San Pedro; that on July 20th said vessel sailed from the port of Eureka, Cal., laden with a cargo of lumber bound for the port of San Pedro in that state; that, at the time of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

leaving Eureka, the vessel was in all respects seaworthy for said voyage, and to carry said cargo, and was properly manned with a competent master, officers, and a full crew; that, soon after leaving Eureka, she ran into a fog of considerable density; that the first mate on the bridge thereupon blew the usual fog signal of a prolonged blast at intervals of not more than one minute, and continued so to do; that a competent lookout was kept on the forecastle, and the ship's lights were burning brightly; that soon thereafter the man on the lookout reported a steamer on the port bow, whereupon, for the purpose of keeping away, the officers in charge caused the schooner's helm to be put to port, the usual fog signal being blown; that a little while later the schooner's helm was again put well over to port, with the object of keeping away from the signal heard on the port bow; that about a minute later the mate on the bridge heard two blasts of a whistle of a steamer, and immediately saw her headlight appear on the port bow; that thereupon he sounded four blasts and stopped the engine of the schooner, but the approaching vessel, the steamship Columbia, was across the schooner's bow, and was struck by the latter not far from her stern, with the result that she sank, and the steam schooner was badly damaged.

The petition alleged that the amount of loss caused by the sinking of the steamer, to wit, the value of the steamer and its cargo and baggage on board, was far in excess of the interest of the petitioner in the said steam schooner; that a number of lives were lost by reason of the collision; that some time during the afternoon of the 21st the steamer George W. Elder came and took the steam schooner in tow and towed her to the port of Eureka; that the collision and the loss, damage, and injury resulting therefrom were done, occasioned, and incurred without the consent or privity or knowledge or design or neglect of the petitioner or any of its directors, officers, or servants; that no freight was earned by her, and none was pending at the time of the disaster; that the owners of the Elder claim salvage against the San Pedro for the service rendered in towing her to Eureka; and that other persons will make claims against her for damages suffered by them, all of which exceed in amount the interest of the petitioner in the said steam schooner. The San Francisco & Portland Steamship Company, the owner of the steamship Columbia, made answer to the petition, and presented its claim for the loss and damage sustained by it. It denied that the San Pedro was in all respects or at all seaworthy for said voyage, or was properly manned with a competent master, or competent officers or crew, and it denied that the Columbia was in fault, and it alleged that the accident resulted from negligence and carelessness of the petitioner, that the master of the schooner was incompetent, and her owner, the petitioner, knew that he was incompetent and had notice and knowledge thereof when it placed him in command of said schooner, and it knew that the schooner was not properly manned or officered or equipped for the said voyage. Certain claimants against the petitioner also made answer, setting forth substantially the defenses that were alleged in the answer of the San Francisco & Portland Steamship Company. The Boston Marine Insurance Company, the appellant herein, also denied upon information and belief that the San Pedro was seaworthy or that she had a competent master or competent officers or a full crew on board, and it alleged that at the time of the collision she was proceeding at full speed through a fog.

Upon the issues and the testimony, the court rendered a final decree in which the following findings of fact are recited: (1) That the steam schooner San Pedro, when she left Eureka upon her voyage referred to in said petition, lacked one deck hand of a full crew. (2) That the failure to have a full crew did not contribute to the collision referred to in the petition, or to any loss resulting therefrom; that the collision mentioned in the petition and all loss, damage, and injury resulting therefrom were occasioned and occurred without the privity of the petitioner. (3) That said collision between the San Pedro and the Columbia was occasioned by the mutual fault of the San Pedro and the Columbia in not going at a moderate rate of speed through the fog prevailing at the time and place of said collision. And the court decreed that the petitioner was entitled to limit its liability in an

amount not exceeding its interest in the San Pedro and her freight pending, to wit, in the sum of $16,500, with interest thereon from July 20, 1907, at 6 per cent. per annum, and the court in the decree fixed the amounts which should be allowed to the respective claimants.

Nathan H. Frank and Irving H. Frank, both of San Francisco, Cal., for appellants.

Page, McCutchen, Knight & Olney, Ira A. Campbell, and William Denman, all of San Francisco, Cal., for appellee Metropolitan Redwood Lumber Co.

Knight & Heggerty, of San Francisco, Cal., for appellee San Francisco & P. S. S. Co.

F. R. Wall, Costello & Costello, and George M. Thomas, all of San Francisco, Cal., for certain claimants.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge (after stating the facts as above). The finding of the court below that the collision between the San Pedro and the Columbia was occasioned by the mutual fault of both vessels "in not going at a moderate rate of speed through the fog prevailing at the time and place of the collision" rests upon testimony received in open court, and must be taken as conclusive.

[1] On the voyage on which the collision occurred, the San Pedro was one man short of the number of seamen required by her certificate of inspection, and it is urged that the trial court erred in finding that that shortage was not one of the proximate causes of the loss, that, if there had been a full crew, a man might have been stationed between the lookout and the officer on the bridge, to pass the word from the former to the latter. But there is no evidence that on any prior voyage any such practice had ever been adopted, or that there was any necessity therefor, or that such an intermediate lookout would have been employed if the complement of the crew had been full. There was no legal requirement for the use of such an intermediary, and there is no proof whatever that the mate did not hear all the calls of the lookout. We think there was no error, therefore, in the finding that the shortage of the crew was not a contributory cause of the loss. It is to be observed in this connection, also, that the manager was not privy to, and had no knowledge of, such shortage, and that the master and the mate had exercised due diligence to secure the additional man needed to take the place of a man who had left the vessel at the last moment.

[2] The principal question in the case is whether, upon the evidence, the court below erred in finding that the collision and the resulting damage and injury were occasioned and incurred without the privity of the appellee. It is contended that the master was incompetent, and that the appellee's manager failed to exercise proper diligence to ascertain whether or not he was competent. It does not follow that the master was incompetent because, on prior voyages, he had permitted the steam schooner to run at full speed in a fog. The vessel was very slow; her utmost speed being 7½ to 8 miles an hour.

The master testified that it was his practice, when the vessel was in clear water, and he was not likely to meet vessels, to navigate her at full speed in foggy weather, and that, if he heard fog signals of passing or approaching vessels, he slowed down and went by the slow bell until he had passed them. There is no evidence as to the density of the fogs through which, prior to the date of the collision, he had run at full speed. In La Bourgogne, 210 U. S. 95, 125, 28 Sup. Ct. 664, 674 (52 L. Ed. 973), the court approved the following language of Townsend, District Judge:

"The question of rate of speed in a fog is one which cannot be determined by set rules, but must be left largely to the discretion of the officers of the ship. They are intrusted with the responsibility of the carriage of mails, freight, and passengers, at the greatest speed which is consistent with safety. Their own lives, as well as those of the passengers and crew, are at stake. The determination of the question, therefore, as to what is to be done in all the varying stages between a light haze and a dense fog, rests upon a great variety of circumstances and conditions, all looking toward the question of what is a moderate rate of speed in existing conditions."

The appellants cite the cases of Richelieu Nav. Co. v. Boston Ins. Co., 136 U. S. 408, 10 Sup. Ct. 934, 34 L. Ed. 398; The Fri (C. C.) 140 Fed. 123; and The Cygnet, 126 Fed. 742, 61 C. C. A. 348. In the first of those cases, the action was upon a policy of marine insurance which excepted "losses and perils occasioned by want of ordinary care and skill in navigation, or by want of seaworthiness." The vessel had stranded several miles off her course, and the trial court had charged the jury:

"If you find that this vessel was stranded by reason of want of ordinary care and skill in her navigation, or by reason of a defective compass, plaintiff is not entitled to recover."

The Supreme Court held that the instruction was properly given, and indeed it is difficult to conceive how it could be contended otherwise in view of the express language of the policy. But there was in that case no finding of incompetence, and the charge of the court had reference to the particular action on the policy. It throws no light on the question of the construction of the statute which provides for limitation of liability.

In the case of The Fri, the accident happened through the master's negligent failure to ascertain from a book of instructions, which he had, that he would meet controlling westerly currents in the vicinity of a certain reef. In applying the provisions of the Harter Act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]), the court said:

"The evidence should show what man the master was, or at least what qualities had the owners a right to ascribe to him, using the diligence to ascertain them demanded by the act. * * * If the act is applicable, and the owners did in fact use proper diligence in the selection of the master, they are acquitted; but the observance of such diligence is a condition precedent to their release."

There was no showing of such diligence in that case, and, for want thereof, the owners were denied the benefit of the Harter Act.

In the case of The Cygnet, it was held that the act of gross negligence on the part of the master, which caused the disaster, raised so strong a presumption that he was not competent as practically to throw the burden on the petitioners to establish the proposition that they used due diligence with reference to his selection, and the court held, in applying the provisions of the Harter Act, that that burden had not been sustained; the petitioners therein having thought it sufficient, to maintain their case, that the owners had no knowledge or reason to believe that the master was not competent. But in the present case, to sustain the petition, the record contains evidence which we consider sufficient to prove not only that the master had had experience, for many years, but that due inquiry was made as to his fitness before he was employed by the appellee's agent.

Nor do we think the evidence sustains the contention that the mate was incompetent. He was employed upon letters of recommendation from the Hammond Lumber Company, a corporation engaged in the same business as that of the appellee, and he held a master's license. All that appears against his record is the fact that just before the collision he was running the San Pedro at an improper speed, and failed to stop her engines upon first hearing the Columbia's fog signals, and failed to observe necessary precautions to prevent a collision. In The Elton, 142 Fed. 367, 73 C. C. A. 467, the court said:

"It is a common experience that a workman, be he ever so competent and skillful, may at some time and on some occasion fail to live up to his own standards."

In Southern Pacific Co. v. Hetzer, 68 C. C. A. 34, 135 Fed. 280, 1 L. R. A. (N. S.) 288, it was said:

"But specific acts of negligence or lack of skill or of incompetence, of which the master had no notice or knowledge prior to the alleged accident, are inadmissible to establish incompetence of a servant who is employed with due care."

Nor does the evidence show that the negligence in navigating the steam schooner at full speed in the fog was with the privity of the appellee's manager. He was not present, and it was shown that he never knew that the vessel had been run at full speed in a fog, and had never heard of any violation of law on the part of the captain of the schooner. In La Bourgogne, 210 U. S. 122, 28 Sup. Ct. 673, 52 L. Ed. 973, it was said:

"Without seeking presently to define the exact scope of the words 'privity' and 'knowledge,' it is apparent from what has been said that it has been long since settled by this court that mere negligence, pure and simple, in and of itself does not necessarily establish the existence on the part of the owner of a vessel of privity and knowledge within the meaning of the statute."

[3] But it is contended that the record does not show that the president and manager of the appellee had, as manager, the requisite knowledge to carry on the business in which the San Pedro was engaged, or to employ her officers. The appellee was a Michigan corporation engaged in manufacturing lumber at a mill some 20 miles inland from Eureka. Its product was carried to that port by rail, and thence was carried by water to San Francisco. For this purpose

the appellee, some six months before the collision, purchased the San Pedro. Thomas J. Atkinson, as the president and manager, acted for the appellee in purchasing the vessel, and in attending personally to the details connected with the operation thereof. It is contended that the evidence proved that he lacked the capacity to do this, and it is argued that, in order to be competent to manage a vessel, one must know something about the "vessel business" and be able to judge of the competency of the people whom he is to employ, and that, in order to use intelligently the reports of employés concerning the fitness of a vessel and the proper equipment thereof, he must know how to manage vessels and know something of the dangers and difficulties to be provided against in navigating the same. It may be conceded that Atkinson did not possess all these qualifications. He was a business man, and, as such, for four years he had been the manager of the appellee's business. But we cannot concede that an owner of a vessel, in order to be entitled to limit his liability under the statutes, must, before sending his vessel on her way, acquaint himself with the science of navigation, or acquire expert knowledge concerning his vessel, its equipment, its machinery, or the necessary crew therefor, or must place between himself and the master an intermediary who shall possess such knowledge, and our attention has been directed to no authority which so holds. In Moore v. American Transportation Co., 24 How. 1, 16 L. Ed. 674, the court said:

"The act was designed to promote the building of ships and to encourage persons engaged in the business of navigation."

And in La Bourgogne, the court affirmed that the law was to be administered in a spirit of fairness with the view of giving to shipowners the full benefit of the immunities intended to be secured by it for the encouragement it will afford to commercial operations.

In Norwich Co. v. Wright, 13 Wall. 104, 121 (20 L. Ed. 585), Mr. Justice Bradley said:

"The great object of the law was to encourage shipbuilding and to induce capitalists to invest money in this branch of industry. Unless they can be induced to do so, the shipping interests of the country must flag and decline. Those who are willing to manage and work ships are generally unable to build and fit them. They have plenty of hardiness and personal daring and enterprise, but they have little capital. On the other hand, those who have capital and invest it in ships incur a very large risk in exposing their property to the hazards of the sea, and to the management of seafaring men, without making them liable for additional losses and damage to an indefinite amount."

In Quinlan v. Pew, 56 Fed. 118, 5 C. C. A. 444, Judge Putnam said:

"We are also constrained to the belief that this statute, which the Supreme Court directs shall be interpreted broadly, has regard for the usual necessities of the occupations of life, and in that respect intends that owners may avail themselves of the proper facilities common to business men, and be relieved, so far as it is concerned, whenever and so far as they have appointed a suitable representative, be he master, consignee, or other agent, to supervise the ship, either at sea or at the home port, or otherwise, and either for fitting her away, or navigating her after she is so fitted away. The law, for the purposes of this case, cannot make a distinction between the owner who has but one vessel and time and opportunity to give it his personal at-

tention, and the owner who has many vessels, or whose necessities call him long distances from his residence, or whose infirmities, sickness, inexperience, or sex renders him or her incapable of attention to affairs of this nature."

In The Annie Faxon, 75 Fed. 312, 21 C. C. A. 366, this court said:

"When we consider the purpose of the law which is under consideration, and the construction that has been given to it by the courts, it is obvious that the managers of a corporation whose business is the navigation of vessels are not required to have the skill and knowledge which are demanded of the inspector of a boiler. It is sufficient if the corporation employ, in good faith, a competent person to make such inspection. When it has employed such a person in good faith, and has delegated to him that branch of its duty, its liability beyond the value of the vessel and freight ceases, so far as concern injuries from defects of which it has no knowledge, and which are not apparent to the ordinary observer, but which require for their detection the skill of an expert."

Upon the recommendation of Capt. Johnson, master of the steamer Iaqua, and after having made inquiries as to Capt. Hansen's capacity, and after having learned that Capt. Hansen had been for seven years in the service of the Alaska Packer's Association, four years of which he had served in the capacity of master of the steam schooner Unimak, and as such, aside from other voyages, had taken the schooner from 16 to 18 trips between Eureka and San Francisco, the appellee's manager engaged Capt. Hansen, who was at that time a duly licensed master. There is no evidence that Capt. Hansen was then reputed to be incompetent, or that any further inquiry would have developed evidence that he was, and we find that, two years after the collision which is the subject of this suit, Capt. Hansen was again in command of the Unimak, with his master's license unrevoked. In this respect the case differs materially from MacGill v. Michigan S. S. Co., 144 Fed. 788, 75 C. C. A. 518, in which this court denied limitation of liability on the ground that the Steamship Company had introduced no testimony to show that the man whom it placed in charge of the alterations on the vessel whereby it was changed from a coal burner to an oil burner, resulting in explosion and loss, was competent, or to indicate that the company had at any time made any inquiry as to his knowledge of the dangerous agent they were about to introduce upon their vessels, or his fitness to handle it. The case is clearly distinguishable also from Parsons v. Empire Transp. Co., 111 Fed. 202, 49 C. C. A. 302, cited by the appellants. In that case one Patterson, an inexperienced man, as was well known to the Transportation Company, was made the company's manager and was allowed to act as general superintendent of all of its business at St. Michaels, and to control its entire fleet in those waters. He personally attended to the shipping of certain freight to be carried to Nome, and loaded the same on a river barge which was wholly unfit for such a voyage at that season of the year. This court held that his knowledge must be regarded as the company's knowledge, and his acts as the acts of the company, and denied limitation of liability, holding that the statutes were not intended to relieve shipowners of responsibility "for their own willful or negligent acts."

[4] It is contended that the San Pedro was unseaworthy because of the location and noise of her oil burners, and that the noise was so great as to prevent the officer on the bridge from hearing the calls of the lookout, or the fog signals of approaching steamers. The evidence is that the San Pedro when purchased by the appellee had the oil burner apparatus which was in common use in vessels of her class, and that she continued to use the same. The testimony of the experts is convincing that the burners were of the type that was in customary use on such vessels. The question of the unseaworthiness of a vessel on account of her equipment is largely determined by custom and usage. The Titania (D. C.) 19 Fed. 101; The Indrapura, 190 Fed. 711, 112 C. C. A. 351. Both the mate and the second mate testified that they had no difficulty in navigating the vessel on account of the noise of the burners. The master who had commanded the San Pedro in 1909 testified that the oil burners did not interfere with determining the direction of sounds, and Capt. Pillsbury, Marine Surveyor, who had had 18 years' experience as master mariner, described experiments which he had made which showed that, with the oil burners going, it was possible, not only to hear the whistles of distant vessels, but to ascertain the direction from which the sounds came.

[5] After the collision, the deck load of the San Pedro was jettisoned, and the vessel was kept afloat only by the lumber in her hold. She was picked up by the Elder, and at some risk and hazard was towed into a port of safety, and the Elder was allowed $4,000 for salvage. The court below referred to a commissioner the question of the value of the San Pedro immediately after the collision, and the value of the freight pending at the time of the collision. Upon the testimony taken by the commissioner, he reported that the value of the vessel when brought into the port of Eureka in her disabled condition was $22,000, that a fair estimate of the expense and cost of taking her to that port, together with a reasonable sum on account of the risk and the hazard to which she might be subject, affecting her then value, and on account of such hazard as the conditions existing at that time would make it reasonable to suppose might attend the work of salving her, so affecting her value, to be the sum of $5,500, leaving the value of the vessel immediately after the collision $16,500. It is contended that it was error to deduct from the value of the vessel after she arrived at the port any more than the sum which was subsequently allowed for salvage. It is not denied that the value of the vessel was to be determined at the place where she was immediately after the collision, and where her voyage ended; but it is said that the sum actually allowed for salvage is all that should be deducted therefrom.

In Pacific Coast Co. v. Reynolds, 114 Fed. 877, 52 C. C. A. 497, in a case where a ship was stranded on a reef and so injured as to terminate her voyage, this court held that a petitioner for limitation of liability must pay the value of the vessel as she lay upon the rocks and the amount of her freight then pending, if any; that her value for such purposes was not affected by the result of any subsequent salvage operation, whether undertaken by the owner or by others;

and that where, at great risk, hazard, and expense, the owner succeeded in rescuing her and having her towed to a port where she was valued, there must be deducted from such valuation not only the expense incurred in her rescue, but also an allowance on account of the risk and hazard of the salvage undertaken, which clearly affected her value as she lay before such operations were commenced.

We see no reason to depart from the rule so declared in that case. The question is: What was the value of the San Pedro as she lay out at sea in her disabled condition, immediately after the collision? In determining that question there must necessarily be taken from her value not only the cost of salvage, but an allowance for the risks affecting the probability of her rescue. There was danger of capsizing. There was danger of the wind driving her in shore. There was danger of fire, for her lumber in the hold had become saturated with oil which had leaked from the forward tank. There were other dangers incident to the undertaking of bringing her into port, all of which affected her value as she lay still afloat but helpless after the collision. The voyage was then ended. Said the court in City of Norwich, 118 U. S. 468–492, 6 Sup. Ct. 1150, 1156 (30 L. Ed. 134):

"Their liability is fixed when the voyage is ended. The subsequent history of the wreck can only furnish evidence of its value at that point of time, and it makes no difference in this regard whether the salvage is effected by the owners or by any other persons."

[6] It is earnestly insisted on behalf of certain of the claimants that the court below erred in decreeing that all the claimants share pro rata in the fund irrespective of their claims to priority as lien claimants or otherwise, and that the court disregarded the fifty-fifth admiralty rule (29 Sup. Ct. xlvi), which provides as follows:

"Proof of all claims which shall be presented in pursuance of said monition shall be made before a commissioner, to be designated by the court, subject to the right of any person interested to question or controvert the same; and upon the completion of said proofs, the commissioner shall make report of the claims so proved, and upon confirmation of said report, after hearing any exceptions thereto the moneys paid or secured to be paid into court as aforesaid, or the proceeds of said ship or vessel and freight (after payment of cost and expense), shall be divided pro rata amongst the several claimants in proportion to the amount of their respective claims, duly proved and confirmed as aforesaid, saving, however, to all parties any priority to which they may be legally entitled."

It is urged that the rule has the force of a statute, and that it must be read as part and parcel of section 4284 of the Revised Statutes. That section provides that, upon the surrender of the vessel, the proceeds shall be distributed among the claimants "in proportion to their respective losses."

In The Catskill (D. C.) 95 Fed. 700, Judge Brown said:

"It is further contended, inasmuch as by the law of the states of New York and New Jersey no liens are given for death claims, while a maritime lien does exist for the damages received by the Catskill, that this entitled the Catskill to a priority for her claim over the death claims. I cannot sustain this contention. Section 4284 of the Revised Statutes, providing for the distribution of the proceeds upon a surrender of the vessel, declares that the proceeds shall be distributed among the claimants 'in proportion to their re-

spective losses,' and no distinction is made between the different kinds of damage, whether to property or person. Injury to person and loss of life are held to be claims within the scope of the statute (In re Long Island North Shore Passenger & Freight Transp. Co. (D. C.) 5 Fed. 599, 624; Butler v. Steamship Co., 130 U. S. 527, 552, 9 Sup. Ct. 612, 32 L. Ed. 1017), and recovery in personam against the owners of the vessel for loss of life is restrained upon the surrender of the vessel in proceedings under the statute (section 4285). It is evident, therefore, that the statute not only makes the fund derived from the sale of a vessel applicable to all claims pro rata (see, also, rule 55 in admiralty), but that it bars all other remedy. The necessary effect of this is to make every admissible claim a statutory lien upon the fund. The fund must be distributed, therefore, according to the statute itself, i. e., pro rata among the claims arising from the collision (Butler v. Steamship Co., supra; The Maria and Elizabeth [D. C.] 12 Fed. 627), saving any special equitable rights as between the parties."

In La Bourgogne, 210 U. S. 110, 139, 28 Sup. Ct. 664, 52 L. Ed. 973, it appears that the court considered the rights of claimants whose claims were diverse, such as those in the case at bar, and recognized the right of all to share in the fund pro rata. As against the force of that portion of the decision as a precedent, it is urged that the question of priority was not under consideration in that case, and that the fifty-fifth admiralty rule is higher authority than the court's decision, and that the last clause of the rule "saving, however, to all parties any priority to which they may be legally entitled," expressly recognizes the distinction between claims which it is urged should have been observed by the court below in distributing the fund in the present case. But we find in the decision in La Bourgogne Case the court's own construction of its rule, together with its construction of the statutes, and the conclusion we reach is that, whatever may be the meaning and scope of the last sentence of the rule, it was not intended thereby to enlarge or alter the plain meaning of the statutes. The construction of the statutes and the rule adopted by Judge Brown in The Catskill Case was followed in The Mauch Chunk (D. C.) 139 Fed. 747, and by the Circuit Court of Appeals for the Second Circuit on the appeal of that case (154 Fed. 182, 83 C. C. A. 276).

[7] Error is assigned to the denial of a proctor's fee for each claimant represented by the proctors at the hearing. The court below held that a proctor representing more than one claim on the final hearing was entitled to tax but one docket fee, and he cited prior decisions of that court in which that rule had been followed. Section 824 of the Revised Statutes (U. S. Comp. St. 1901, p. 632) allows a docket fee to proctors on a final hearing in admiralty, and it would seem that its meaning is that it is a fee to be allowed the proctor as an incident to his appearance and service in court on the hearing, and not as a fee for appearing for each client whom he represents. This was the view taken by Judge Benedict in The Medusa (D. C.) 47 Fed. 821. In that case the owner of the Medusa libeled a tug for collision, and the owner of the tug filed a libel against the Medusa for damages arising out of the same collision. Separate stipulations and separate answers were filed, and the two causes proceeded to hearing as two separate suits. The court said:

"As the causes were heard together, one proctor's docket fee should be allowed."

In The H. C. Grady (D. C.) 84 Fed. 226, where a number of libels against the same vessel, represented by the same proctor, were consolidated and heard at the same time, Judge De Haven held that but one docket fee should be allowed, and he subsequently made the same ruling in The Mount Eden (D. C.) 87 Fed. 483. In The Gordon Campbell (D. C.) 131 Fed. 963, 14 libels were filed by four different proctors. The court consolidated the claims for hearing and said:

"The adjudicated cases upon the subject of costs in admiralty do not permit allowing to a proctor, who represents more than one petition, separate docket fees."

In The Stanley Dollar, 160 Fed. 911, 88 C. C. A. 93, this court said:

"Where the libels are consolidated, as in the present instance, but one docket fee can be allowed."

Counter to this line of decisions is the decision in Re Excelsior Coal Co. (D. C.) 136 Fed. 271, where it was held, in a proceeding for a limitation of liability, that each separate person claiming damages and recovering the same is entitled to a separate proctor's fee payable by the stipulators for costs and not out of the fund. That rule was affirmed by the Circuit Court of Appeals (142 Fed. 724, 74 C. C. A. 56), but in neither case was there a reference to or a discussion of prior adjudications. We are of the opinion that the true construction of the statute is as it was first stated by Judge Benedict in The Medusa, and by this court in The Stanley Dollar, that it is a fee for the proctor for his appearing in court on a final hearing, and that proceedings on a petition for a limitation of liability are necessarily in their very nature a consolidation of actions.

[8] Nor do we find that the court erred in ordering that the cost of issuing and publishing the monition be paid out of the fund. All that the petitioner in such a case is required to pay is the expense incurred in availing himself of the act of Congress, the cost of filing the petition and stipulation for costs and value, and the expense of appraisal, etc. In The W. A. Sherman, 167 Fed. 976, 93 C. C. A. 228, the Circuit Court of Appeals for the Second Circuit said:

"The cost of bringing in the creditors, such as filing, issuing, and publishing the monition, should be paid out of the fund, on the principle that it should administer itself, and this duty to administer itself applies even when, the petitioner being held not liable, there is no other distribution than to return it to him."

We find no error.
The decree is affirmed.