## THE YUNGAY.
### In re WEBSTER.

District Court, S. D. New York.
Nov. 27, 1931.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark, A. Howard Neely, and Norman M. Barron, all of New York City, of counsel), for petitioners.

Bigham, Englar, Jones & Houston, of New York City (Oscar R. Houston, Henry N. Longley, and W. J. Nunnally, Jr., all of New York City, of counsel), for claimants.

PATTERSON, District Judge.

This is a proceeding to limit liability brought by the owner and charterers of the steamship Yungay. The Yungay struck a reef off Eleuthera Island in the Bahamas on February 7, 1928, and became a total loss. The petition, as amended at the trial, alleged that due diligence had been used to render the vessel seaworthy and that she was in fact seaworthy, and that the disaster was an inevitable accident, due solely to hurricane, mountainous waves, and strong currents. After stating that the loss was without privity or knowledge on their part, and that the pending freight amounted to $5,249.70, the petitioners claim nonliability for any damage, and, in the alternative, limitation of liability. The claimants disputing the petition are the West India Oil Company, owner of the cargo, and several seamen who lost their personal effects when the Yungay went down.

The Yungay was a small coasting steamer built in 1908 with a length of 165 feet and beam of 28 feet. The plimsol mark was 5 feet 4 inches below the statutory deck line, the draft below the plimsol mark being 14 feet 5 inches. (Her freeboard had formerly been 8 feet 1½ inches. The raising of the plimsol mark was due to the permanent closing of cargo ports and scuppers.) Late in December, 1927, after having been laid up for five months at a dock at Bayonne, N. J., she was purchased by J. S. Webster, one of the petitioners, who prepared to take her to Jamaica where he lived. On making the purchase, Webster arranged to have her drydocked and surveyed by Lloyds. Considerable repairs were then made under the direction of the master and the surveyor, involving an expense of $9,000. After the repairs had been made, certificates covering the hull and the machinery were issued by Lloyds, to the effect that the vessel was seaworthy and classed 100 A1. The master, mate, and two engineers were men who had been in Webster's employ on other ships and had been brought up from Jamaica. The entire personnel, including officers, was fifteen. It appears that no adjustment of the three compasses on the ship was made at any time after Webster made the purchase. Webster inquired of the master as to the compasses, and was informed that the master would attend to the adjusting himself if Webster would buy him an azimuth mirror, which Webster did buy.

A cargo of oil and gasoline owned by the West India Oil Company was taken on board, to be delivered at Port au Prince, and the Yungay set forth on her voyage on February 1, 1928. The customary route from New York to Port au Prince is a direct one south to San Salvador, and thence through the Crooked Passage. Instead of taking this route, the vessel followed a route not shown to have been customary. From New York she went down the Atlantic Coast as far as Jupiter Inlet, Fla., hugging the coast and picking up the different lights, and then took an easterly course through the Bahamas. This route was over 300 miles longer than the direct route. According to Webster, he expected that the master would take this route down the coast, though he did not command him to take it. By the afternoon of February 7th, the Yungay had passed through the Northwest Providence Channel and was off the north end of Eleuthera Island which could be seen several miles off starboard.

The wind was brisk, from the northeast, and the sea was rough, but no weather approaching a hurricane was encountered. At 5:15 the master changed the course he was steering, south 73 degrees east, to south 55 degrees east, expecting to make good south 45 degrees east. His belief was that the course made good would take him direct to San Salvador and would at the same time give him a sufficient clearance off the east coast of Eleuthera, along which he was proceeding. The Yungay, however, actually took a course almost due south and far nearer Eleuthera than the master supposed she was taking. At about 7 p. m., she struck a reef two or three miles off the east coast of Eleuthera. She could not be extricated, and began to fill. There was a bad list to port, which rendered it impossible to launch the port lifeboat on the weather side. The starboard lifeboat was launched, however, and made the shore with every one on board. The ship proved to be a total loss.

The bills of lading under which the cargo was carried were signed by Webster personally. They contained certain clauses that bear upon the controversy between the cargo owner and ship owner. A deviation clause accorded to the vessel liberty "to proceed via any route to destination and to deviate in the course of the voyage as the master may deem best in his judgment." Other clauses exempted the carrier from loss caused by dangers or accidents of the sea; also from loss caused by unseaworthiness or by faults or errors in navigation, provided due diligence had been exercised to make the vessel seaworthy. Still another clause provided that the shipment should be subject to the Harter Act (46 USCA §§ 190–195), and also to sections 4282 to 4287 (46 USCA §§ 182–187), each inclusive, of the United States Revised Statutes, which are the acts relative to limitation of liability.

In the foregoing summary of the facts of the case, I have not mentioned certain matters concerning which evidence was offered. There was testimony in behalf of the claimants that both at the commencement of and during the voyage large quantities of water collected on the floor of the forecastle and messroom, coming from leaks in the forward bulkhead, deck, and skin of the ship, and similarly as to water in the fireroom and engine room. This testimony is sharply contradicted, and I do not think that any reliance can be placed upon it. There probably was a small amount of water in the forecastle and messroom that came from snow on the deck or from sweating, but no large quantities came in streams from leaks, as some of the claimants' witnesses asserted. There was also testimony that the plimsol mark was under water when the Yungay left New York. This is contradicted by evidence which I regard as more credible; the claimants' witnesses must have referred to the old and superseded plimsol mark. It was also claimed that the lifeboats were unseaworthy. Here again the evidence is in conflict, and the conflict is resolved in favor of the petitioners. On the other hand, certain testimony offered by the petitioners is not credible. There is no doubt that the master and others grossly exaggerated the severity of the wind and waves at the time of the trouble. The incident of the smashed lifeboat on the port side did not occur at the time of the stranding. The master himself did not mention any smashing at the inquiry held a few days after the disaster; he stated then that the port lifeboat could not be launched because of the list of the ship. The petitioners' witnesses also sought to convey the impression that the visibility on the 7th was much worse than it actually was. All of these alleged conditions and occurrences are disregarded as against the weight of evidence.

As to the cause of the loss of the Yungay and its entire cargo there is no room for a reasonable difference of opinion. The proof shows that the loss was due to bad seamanship by the master, coupled with defective compasses. That the master made a blunder on the 7th in changing the course at 5:15 p. m. to what he thought was south 55 degrees east was testified to by the petitioners' own experts. Even with dependable compasses this would be a risky maneuver, giving the ship a questionable clearance off Eleuthera with an onshore wind and unknown currents. The fact is, however, that the compasses were not dependable; a condition which played an important part in bringing the ship to the reef. The evidence on the point is convincing. In the first place, the proof is undisputed that after the five months' lay up of the Yungay, and the extensive repairs made to her, the compasses were bound to be erratic and in need of adjustment. They were never adjusted. The old deviation card, which the master says he relied upon in part, was worthless after the lay up and repairing. In the second place, there is evidence that, in the course of the voyage itself, the compasses performed in a manner which revealed their unreliability as navigating instruments. Deviations were unusually large, and varied

a great deal on different courses. A change by compass of a few degrees to the left resulted in actually changing her head considerably to the right. Captain Wall, one of the petitioners' witnesses, conceded that the compasses were proved to be erratic by the ship's log and the master's testimony. The petitioners themselves in effect have admitted the defectiveness of the compasses on the voyage, for in their brief they say that the master should not have steered on course south 55 degrees without first determining the deviation of the compasses on that course. The petitioners label this an error in navigation, but oviously it goes to the effectiveness of the compasses themselves. A compass which can be used only when checked by observations is of little utility, for the time comes (as it did here) when an observation on a course cannot be taken. As against all this evidence, the master's insistence that the compasses functioned properly during the voyage counts for nothing. His statement that the standard compass and the steering compass corresponded with one another at all times, showing uniformity in huge deviations, is incredible. The fact that he made all his objectives on the voyage proves noth'ng. He ran from light to light for most of the distance, and even then seems to have wandered about to some extent.

The wind and waves were not an important factor in the stranding. The waves were doubtless high for a small ship like the Yungay, but she was at all times under control of those in charge of her. The lifeboat carrying fifteen men had no trouble in reaching the island, which precludes any possibility that a wild storm was raging. Indeed, the petitioners, though alleging hurricane and mountainous waves in the petition as the cause of driving the ship on the reef, made no real effort at the trial to sustain these allegations by proof. An attempt was made to prove a strong current setting west in this vicinity, but the force of the current at the time in question was not satisfactorily shown. In any event, the existence of a strong current would not rule out of the case the elements of fault in navigation and defective compasses as prime causes of the disaster. But for these the Yungay would never had been near the reef. The facts show that the stranding was due to poor navigation and to erratic compasses.

1. The first question of law presented is whether the petitioners are under any liability to those who suffered damage by the stranding of the Yungay. The issue as to limitation of liability is presented only if liability be found. The Rambler (C. C. A.) 290 F. 791. As an ocean carrier on a general ship, the owner is liable for loss of cargo unless he can show that the loss came about through one of the causes specified in the bills of lading as exempting him from liability. I have already indicated that the loss was not due to dangers of the sea. The exceptions as to errors in navigation and unseaworthiness are the only ones applicable, and both are contingent (as they must be under the Harter Act) upon the exercise of due diligence to render the ship seaworthy. Although the Yungay seems to have been seaworthy in all other respects, the defective condition of the compasses made her unseaworthy at the commencement of the voyage and at all times thereafter. This is too clear for argument. Richelieu & Ontario Navigation Co. v. Boston Marine Ins. Co., 136 U. S. 408, 425, 10 S. Ct. 934, 34 L. Ed. 398. It is also clear that due diligence was not used to put the ship in seaworthy condition. The master was negligent in going to sea without compensating the compasses. His failure to exercise due diligence toward seaworthiness is enough to defeat the claim of nonliability, for the due diligence required under the bills of lading and the Harter Act (46 USCA §§ 190–195) is not that of the owner alone. Due diligence also on the part of his agents and servants is necessary. International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 225, 21 S. Ct. 591, 45 L. Ed. 830; The Southwark, 191 U. S. 1, 13, 24 S. Ct. 1, 48 L. Ed. 65. The owner's claim of complete exoneration from liability therefore cannot be allowed. The foregoing discussion relates particularly to the cargo carried under the bills of lading, but the conclusion is the same as to the personal effects of the seamen. The loss of these articles came about through the lack of due diligence to make the ship seaworthy, and the liability of the owner for damages of this character is clear.

2. The closer question is whether the petitioners are entitled to limit their liability. This issue turns on Webster's privity or knowledge as to the condition of the compasses. Section 4283 of the Revised Statutes (46 USCA § 183) provides that the liability of the owner of a vessel for losses suffered "without the privity, or knowledge of such owner or owners" shall not exceed the value of his interest in the vessel and pending freight. The privity or knowledge which removes a case from the operation of the act

involves a personal participation of the owner in some fault or act of negligence causing or contributing to the injury. Craig v. Continental Ins. Co., 141 U. S. 638, 12 S. Ct. 97, 35 L. Ed. 886; The Colima (D. C.) 82 F. 665; The 84–H (C. C. A.) 296 F. 427. Ordinarily the owner may rest his duty to make the ship seaworthy upon a suitable agent, and thus be relieved under the limitation act, where he has no notice or knowledge of the agent's negligent performance of the duty. Quinlan v. Pew (C. C. A.) 56 F. 111; The Annie Faxon (C. C. A.) 75 F. 312; The Tommy (C. C. A.) 151 F. 570; The City of Camden (C. C. A.) 292 F. 93. But the burden of proving this lack of privity or knowledge, his own nonparticipation in the fault or negligence causing the injury, is upon the owner. In re Reichert Towing Line (C. C. A.) 251 F. 214; The 84–H, supra; Petition of Sinclair Navigation Co. (D. C.) 27 F.(2d) 606.

■ It may be argued that the proper conditioning of the compasses was a matter so vital to the safety of every one and everything on board as to constitute a nondelegable duty of the owner. See In re Spencer Kellogg & Sons, Inc., (C. C. A.) 52 F.(2d) 129, 132; In re Jacobson (D. C.) 52 F.(2d) 179, 180. But instances of nondelegable duties on the part of the owner, usual enough in simple cases of negligence where the issue is whether due care has been exercised to make the ship safe and seaworthy [see Christopher v. Grueby (C. C. A.) 40 F.(2d) 8, 12, and authorities cited], are rarely found in limitation of liability issues, and the reason is plain. The limitation acts entitle the owner to a limitation of his liability for losses suffered without his privity or knowledge, meaning actual and not constructive privity or knowledge as already pointed out. The act would fail of its purpose, the encouragement of the business of navigation, if full liability should be visited upon owners through the creation and imposition on them of nondelegable duties. The Supreme Court has repeatedly declared that the act should be applied with due regard to its purpose, and that reasons should not be invented by the courts for taking cases out of the protection of the act. Providence & N. Y. S. S. Co. v. Hill Mfg. Co., 109 U. S. 578, 3 S. Ct. 379, 617, 27 L. Ed. 1038; The La Bourgogne, 210 U. S. 95, 28 S. Ct. 664, 52 L. Ed. 973; Richardson v. Harmon, 222 U. S. 96, 32 S. Ct. 27, 56 L. Ed. 110; Capitol Transportation Co. v. Cambria Steel Co., 249 U. S. 334, 39 S. Ct. 292, 63 L. Ed. 631. The caution expressed by Mr. Justice Holmes in the Cambria Case must be borne in mind: "We very much appreciate the danger that the act should be cut down from its intended effect by too easy a finding of privity or knowledge on the part of owners, as also by too liberal an attribution to them of contracts as personally theirs." Page 336 of 249 U. S., 39 S. Ct. 292.

In my opinion, the duty here could be deputed. The owner, who was not a navigator, was not obliged to study the science of navigation or acquire expert knowledge concerning his vessel and equipment before sending her out. It cannot be said that at his own peril he left the adjustment of the compasses to another. Boston Marine Ins. Co. v. Metropolitan Redwood Lumber Co. (C. C. A.) 197 F. 703, 709.

■ We come back to the question, the crucial one as to limitation, whether Webster has shown that the faulty condition of the Yungay's compasses when she set forth on the voyage was without his personal participation. I incline to the view that he has. I accept as true his testimony as to inquiring of the master about the compasses and being told that the master himself would do the necessary adjusting. Webster apparently knew enough about ships to realize that the compasses would need adjustment after the lay up and repairs, and he put the duty of adjusting them upon the master, who held himself out as competent to do the work. The latter had been in his employ about eight years, and had had a master's license for about five years. Webster seems to have had reasons for thinking that the master was competent to adjust compasses. His masters had always attended to repairing compasses; in Jamaica there were no professional compass adjusters. The claimants have shown that another ship, the Eros, was purchased by Webster in 1926, that the same master adjusted her compasses, and that the Eros stranded in 1927. But the master was apparently exonerated from fault in the matter; in any event there is nothing to indicate that the compasses on the Eros were defective. The claimants also introduced evidence tending to show a custom in this port to call in a professional compass adjuster after a ship has been laid up. It may well be that such is the practice of most of the established steamship lines, but there is insufficient proof in the record for me to find that the practice is also prevalent among owners of small vessels like the Yungay. The petitioners showed that the practice is not universal even with steamship lines. In

short, the proof indicates that the owner rested the duty of adjusting the compasses upon an agent who was believed by him, not without reason, to be competent to do the job. This being the case, the owner is entitled to limit his liability for loss occasioned by the agent's nonperformance of the duty laid upon him. Quinlan v. Pew, supra; The City of Camden, supra.

3. There is another feature which, the claimants say, takes the case out of the limitation act so far as liability for the loss of cargo is concerned. The bills of lading were signed by Webster himself, and thus were his own contracts. Reliance is placed upon the line of cases holding that the limitation statute does not affect the liability of the owner on his own contracts. Pendleton v. Benner Line, 246 U. S. 353, 38 S. Ct. 330, 62 L. Ed. 770; Luckenbach v. W. J. McCahan Sugar Co., 248 U. S. 139, 39 S. Ct. 53, 63 L. Ed. 170, 1 A. L. R. 1522; The Loyal (C. C. A.) 204 F. 930, 931; Tucker Stevedoring Co. v. Southwark Mfg. Co. (C. C. A.) 24 F.(2d) 410. It is unnecessary to decide whether this case is governed by that rule, because here the bills of lading contained a clause to the effect that the shipments were subject to the terms of "sections 4282 to 4287, each inclusive, of the United States Revised Statutes." The situation therefore is precisely as if the bills of lading had provided in full that the owner should not be liable beyond the value of the ship and pending freight for any loss or injury to the goods caused without his privity or knowledge. The parties were at liberty to make such an agreement if they saw fit. No public policy interferes with carrying their intention into effect. See Warner Sugar Refining Co. v. Munson S. S. Line (D. C.) 23 F.(2d) 194, affirmed in (C. C. A.) 32 F.(2d) 1021; Earle & Stoddart, Inc., v. Ellerman's Wilson Line, Ltd., (D. C.) 45 F.(2d) 231. So even if the personal signature of the owner to the bills of lading made them his own contracts and would ordinarily take the case, so far as limitation for loss of cargo is concerned, outside the operation of the limitation act, it is brought back within the act by express stipulation of the owner of the cargo and the owner of the ship.

4. Finally, the case presents the issue of deviation. The Yungay did not proceed to her destination by the direct and customary route. If there was a deviation sufficient to constitute a breach of the contract of carriage, then the carrier would be liable for the loss without any benefit from the exceptions written into the bills of lading. And since there is evidence that the owner expected her to take the route she did take, and did not command the master to take the usual route, there would be no limitation of liability. The Frederick Luckenbach (D. C.) 15 F.(2d) 241; The Pelotas (D. C.) 43 F. (2d) 571. But here again the bills of lading must be considered. They gave the Yungay liberty "to proceed by any route to destination and to deviate in the course of the voyage as the master may deem best in his judgment." This provision doubtless would not justify the vessel's wandering about the sea in an aimless fashion (The Willdomino, 272 U. S. 718, 47 S. Ct. 261, 71 L. Ed. 491); on the other hand, it cannot be said that the clause gave the vessel no freedom of movement whatsoever. Its proper effect is to permit the ship to proceed to destination by any reasonable route, whether or not the usual one. Dietrich v. United States Shipping Board Emergency Fleet Corp. (C. C. A.) 9 F.(2d) 733; The Frederick Luckenbach, supra; The Emelia S. de Perez (D. C.) 287 F. 361, affirmed in (C. C. A.) 288 F. 1019. The route down the coast to Florida and thence through the Bahamas was not an unreasonable route in this case. The Yungay was a small coasting steamer. The season was one in which the open Atlantic was known to be stormy. Several expert witnesses approved of the route for a vessel of this type. Under the circumstances, it cannot be said that the master in choosing this route abused the discretion vested in him under the bills of lading. The issue of deviation is decided in favor of the petitioners.

Two points of minor importance are mentioned by the claimants; the fact that the ship lacked one oiler on the voyage, having two instead of three, and the fact that the fog whistle could not be blown when the ship started out from New York. But there was no causal connection between these matters and the stranding, and they play no part in the case. Boston Marine Ins. Co. v. Metropolitan Redwood Lumber Co. (C. C. A.) 197 F. 703; The Suduffco (D. C.) 33 F.(2d) 775; Hartford & N. Y. Transp. Co. v. Rogers & Hubbard Co. (C. C. A.) 47 F.(2d) 189.

From the foregoing discussion, it follows that the petitioners are liable for the loss of the cargo and of the seamen's effects, but the liability is limited to the value of the vessel and pending freight. The prayer for complete exoneration will be denied; the prayer for limitation will be granted. A decree may be submitted on two days' notice.